UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 6, 2013

UNITED STATES OF AMERICA

– v.–

CARLOS ACOSTA,
    a/k/a "Paco,"

        Defendant.

**MEMORANDUM
OPINION & ORDER**

S1 12 Cr. 224 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendant Carlos Acosta is charged with (1) conspiring to distribute, and possessing with intent to distribute, more than one kilogram of heroin, in violation of 21 U.S.C. § 846; (2) distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A); and (3) distributing and possessing with intent to distribute oxycodone, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (Superseding Indictment (Dkt. No. 11))

        Acosta has moved to suppress (1) his post-arrest statements; and (2) evidence obtained from his person at the time of his arrest, from inside an apartment at which he was staying, and from a vehicle in which he traveled.  Acosta has also moved to suppress identification evidence provided by two cooperating witnesses, arguing that the identification procedures used were unduly and unnecessarily suggestive.  Finally, Acosta has moved for an order requiring the Government to produce evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).  (See Dkt. Nos. 19 and 33 (Notice of Motions))

        For the reasons stated below, Acosta's motions will be denied in their entirety.

## BACKGROUND

### I.     ACOSTA AND DOMENECH'S AFFIDAVITS

In support of his motion to suppress, Acosta has submitted affidavits from himself and from Rosalia Domenech, his common-law wife, alleging the following facts:  On January 16, 2012, Acosta and Domenech drove from Massachusetts to New York to visit Acosta's grandmother.  (Acosta Aff. ¶ 5; Domenech Aff. ¶ 5)  After arriving in New York, they stayed at the apartment of Domenech's sister – Apartment 1B, 1104 East Tremont Avenue, in the Bronx.  (Acosta Aff. ¶ 6; Domenech Aff. ¶ 6)  Acosta and Domenech brought separate bags, and Domenech does "not have permission to touch [Acosta's] bag or [his] belongings."  (Acosta Aff. ¶ 7; see also Domenech Aff. ¶¶ 8-9)  Acosta and Domenech are native Spanish speakers and understand and speak very little English.  (Acosta Aff. ¶ 4; Domenech Aff. ¶ 4)

On January 17, 2012, after dinner, Acosta stepped out of the apartment to take out the garbage.  (Acosta Aff. ¶¶ 10-11)  He was immediately surrounded by five agents, handcuffed, and placed in a police car.  (Id. ¶ 12)  Acosta says that he was terrified, and that he was not given Miranda warnings.  (Id. ¶¶ 12-13)  Once in the vehicle, Acosta claims that one of the agents asked him which apartment he was staying in.  (Id. ¶ 13)  Acosta did not believe that he "was allowed to refuse to answer" (id. ¶¶ 12-13), so he told the agents he was staying on the first floor.  (Id. ¶ 13)  All but one agent then left and entered 1104 East Tremont Avenue.  (Id. ¶ 14)  Acosta further alleges that no agent asked him in Spanish for his consent to search Apartment 1B or his belongings, and that he never gave such consent.  (Id. ¶¶ 16-17)

When Acosta left Apartment 1B to take out the garbage, Domenech was inside the apartment.  (Domenech Aff. ¶ 14)  She heard knocking at the door.  (Id. ¶ 16)  When she went to the door, she saw her cousin, Santo, with three agents.  (Id. ¶ 17)  Santo told her that

Acosta was outside in handcuffs and that agents wanted to search Acosta's bag.  (Id. ¶ 18)
Domenech was "very frightened" and "did not know what to do."  (Id. ¶ 19)  One of the agents
asked Domenech if it would be okay for him to check the bags.  (Id. ¶ 20)  Domenech claims that
she thought she had no choice but to consent.  (Id. ¶ 21)  A female agent then asked Domenech
to identify which was her bag and which was Acosta's bag.  (Id. ¶ 22)  That agent then searched
Domenech's bag and found nothing.  (Id. ¶ 23)  The agent then asked which bag was Acosta's.
(Id. ¶ 25)  Domenech "acquiesced" to the search of Acosta's bag because the agent "gave [her]
the impression that [Acosta] had given her permission to search his bag."  (Id. ¶ 25)  The agent
recovered zip-lock bags of pills from Acosta's bag.  (Id. ¶ 30)

      The agents then asked Domenech for permission to search a Honda FIT vehicle
parked outside 1104 East Tremont Avenue.  (Id. ¶ 32)  Domenech was the registered owner of
the vehicle,[1] but she had given Acosta "permission to be inside the van, to travel with
[Domenech], and to store his belongings in the van."  (Id. ¶¶ 33-34 and Ex. A (certificate of
title))  Domenech provided agents with keys to the Honda FIT.  She now claims that she did not
want to give her keys to the agents, "but under the circumstances, I felt I had no alternatives. . . .
I felt pressured to permit the search."  (Id. ¶¶ 35-38)  Domenech followed the agents outside and
was present when they searched the Honda.  (Id. ¶¶ 36-37)

      After the search of the vehicle, Acosta was transported to jail, where he was read
his Miranda warnings in Spanish.  (Acosta Aff. ¶¶ 22-23)  Acosta said that he did not want to
answer questions and asked for a lawyer.  (Id. ¶ 23)  Over the next two hours, agents nonetheless
questioned Acosta, but he kept repeating that he wanted a lawyer.  (Id. ¶ 24)  Agents told Acosta
"that they had recovered pills from the apartment and they wanted to know to whom the pills

---

[1]  Acosta also states that the Honda was his "wife's car."  (Acosta Aff. ¶ 21)

belonged." (Id. ¶ 25)  Agents also told Acosta that if he "gave up [his] 'source,' [he] could probably go free.  [Acosta] still refused to speak with [the agents]." (Id. ¶ 25)  After "constant questioning," however, Acosta "could not take it anymore and [he] gave in," admitted the pills were his, and told agents that Domenech did not know that Acosta had the pills. (Id. ¶ 26)

## III.    THE GOVERNMENT'S EVIDENCE

### A.    The November 22, 2011 Heroin Arrest

The Court conducted an evidentiary hearing concerning Acosta's suppression motion on January 2, 2013.  The Government called Drug Enforcement Administration ("DEA") Special Agents Angela Lisboa and Bruce Hom, and Supervisory Special Agent Orville Greene to testify.  Acosta did not testify and did not call any witnesses.  During the hearing, Agent Lisboa referenced a January 13, 2012 affidavit ("Lisboa Affidavit") she submitted in support of a warrant to obtain GPS tracking data for a cell phone with the assigned call number of (781) 267-5056.  (Tr. 11[2]; see also Govt. Supp. Opp. Br. (Dkt. No. 37), Ex. A (Lisboa Affidavit))  In resolving the pending suppression motion, the Court has also considered the information set forth in the Lisboa Affidavit.

In November 2011, a confidential source ("CS") advised the DEA that the CS had arranged to purchase heroin that would be provided by an individual known as "Paco."  (Lisboa Aff. ¶ 8(a))  The transaction was scheduled for November 22, 2011 at 167th Street and Audobon Avenue in Manhattan.  (Id.)  An individual (CW-1) arrived at that location at the appointed time and handed the CS a package containing 224 grams of heroin.  (Id. ¶ 8(b))  CW-1 was then arrested.  (Id.)  A consent search of CW-1's vehicle led to the recovery of an additional 1,057 grams of heroin.  (Id. ¶ 8(c))  CW-1 agreed to cooperate, and told the arresting agents that the

---

[2]  "Tr." refers to the transcript of the January 2, 2013 suppression hearing.

heroin belonged to an individual known to him as "Paco," who lived in Boston.  (Id. at ¶ 8(b)-(d); Tr. 8-9)  CW-1 did not have an address for "Paco" but described him as a "tall, stocky, overweight Dominican . . . approximately 45 to 46 years old."[3]  (Tr. 10)

   CW-1 consented to a search of a cell phone found on his person at the time of his arrest.  (Lisboa Aff. ¶ 8(e))  Agent Lisboa found three telephone numbers for "Paco" on CW-1's cell phone (collectively "Paco's Cell Phones").  CW-1 confirmed that all three numbers were for cell phones used by "Paco," the owner of the heroin seized on November 22, 2011.  (Tr. 9, 73; Lisboa Aff. ¶ 8(e))  All three numbers had a Massachusetts area code.  (Lisboa Aff. ¶ 8(e), 13)  Records for CW-1's cell phone confirmed that CW-1 had communicated with one of Paco's Cell Phones on November 22, 2011.  (Id. ¶ 8(e))

   Agents attempted to identify "Paco" from subscriber information for the Paco Cell Phones, but there was no true subscriber information for these phone numbers.  (Tr. 12-13)  Moreover, use of the Paco Cell Phones ceased shortly after the November 22, 2011 arrest of CW-1.  (Lisboa Aff. ¶ 9)

  **B.** **Toll Record Analysis**

   Agent Lisboa analyzed toll records for Paco's Cell Phones.  That analysis revealed that Paco's Cell Phones had been frequently used to call and receive calls from a cell phone bearing the number 718-772-7012 (the "718 Number").  (Lisboa Aff. ¶ 10; Tr. 73-74)  Indeed, Paco's Cell Phones had contacted the 718 Number hundreds of times between November 1, 2011 and December 22, 2011.  (Lisboa Aff. ¶ 16)

---

[3]  At the suppression hearing, Agent Lisboa testified that two individuals were arrested with heroin on November  22, 2011, that both agreed to cooperate, and that both provided the same information concerning "Paco."  (Tr. 9-10) The role of the second cooperating witness (CW-2) in the underlying heroin transaction is not clear from the record, however.

Toll records further indicated that shortly after CW-1's November 22, 2011 arrest, the 718 Number began to be in frequent contact with, seriatim, three other numbers with Massachusetts area codes.  (Id. at ¶¶ 11, 13)  The first Massachusetts number was contacted by the 718 Number, and was in operation, between November 22, 2011 and December 26, 2011. (Id. ¶ 11)  The second Massachusetts number was in frequent contact with the 718 Number, and was in operation, between December 26, 2011 and January 2, 2012.  (Id.)  Beginning on January 2, 2012, frequent contact between the 718 Number and a third number with a Massachusetts exchange – (781) 267-5056 – began.  (Id. at ¶ 12)  Indeed, between January 2, 2012 and January 8, 2012, 57 calls were made between the 718 Number and (781) 267-5056 (the "Target Cell Phone").  (Id.)  Moreover, the account for the Target Cell Phone was activated on January 2, 2012, the same day that the account for the second Massachusetts number was suspended.  (Id. at ¶¶ 11-12)

Analysis of toll records revealed that Paco's Cell Phones and the Target Cell Phone were in frequent contact with at least 17 of the same telephone numbers.  (Id. at ¶ 14; Tr. 74-75)

Based on the information discussed above, Magistrate Judge Fox issued a GPS tracking warrant for the Target Cell Phone on January 13, 2012.

## C.  Acosta's Arrest

On January 17, 2012, based on GPS data obtained pursuant to the tracking warrant, Agent Lisboa and other agents determined that the Target Cell Phone was in the vicinity of 1104 East Tremont Avenue in the Bronx.  (Tr. 13-14)  Agent Lisboa testified that based on her experience using GPS data "on numerous occasions," such data can provide "an accurate proximity" of the cell phone to "approximately 300 meters."  (Tr. 14)

Surveillance agents in the vicinity of 1104 East Tremont Avenue observed a silver Honda FIT bearing Massachusetts license plates.  (Tr. 15)  The presence of this vehicle outside 1104 East Tremont Avenue supported the agents' suspicion that "Paco" was in the area, given the cooperating witnesses' statements that "Paco" was from Boston.  (Tr. 9, 15, 83, 98)

While conducting surveillance outside 1104 East Tremont Avenue, Agent Lisboa observed "an individual fitting the description of Paco" standing with a group of other men.  (Tr. 15)  Agent Lisboa approached this group and called out "Paco."  (Tr. 16)  The individual fitting "Paco"'s description – later identified as Acosta – was the only man who turned around.  (Tr. 16, 83-84, 98)  Acosta was taken into custody.  (Tr. 16)

Agent Lisboa then asked Acosta

> where he was staying in 1104 East Tremont, and he stated he was staying in apartment 1B.  I asked him where he came from and he said that he came from Boston, Massachusetts. . . . I further asked him what he goes by . . . and he stated Paco.

(Tr. 17)  Most of this conversation took place in Spanish.[4]

Agents searched Acosta and recovered, inter alia, a cell phone.  (Tr. 19)  Agent Lisboa turned on the cell phone and "saw that the phone number on the cell phone . . .  matched up to the same number that the GPS tracking warrant was issued on."  (Tr. 20)

Agent Lisboa then placed Acosta in the back seat of an agent's vehicle.  (Tr. 20)  In order to confirm that Acosta was in fact "Paco," Agent Lisboa took two photographs of Acosta and transmitted them via text message to CW-1.  (Tr. 20-21, 40, 42; see GX-3 (photograph of Acosta))  CW-1 confirmed that Acosta was known to him as "Paco" and that he had provided the heroin that was seized on November 22, 2011.  (Tr. 21, 40, 42)

---

[4]  While Agent Lisboa is not a native Spanish speaker, she studied Spanish in high school and college, speaks Spanish socially with friends, and converses in Spanish in performing her duties as a DEA agent.  (Tr. 18, 68)

After receiving confirmation from CW-1 that Acosta was "Paco," Agents Lisboa and Hom got into the car with Acosta. (Tr. 21-22)  Agent Lisboa read Miranda warnings to Acosta in English, but it appeared that Acosta did not understand English. (Tr. 22)  Agent Lisboa then gave Acosta a DEA-issued Spanish-language Miranda card to read. (Tr. 22-23)  Acosta was not able to read the card, however. (Tr. 23)  Agent Lisboa then read the Spanish-language Miranda card to Acosta.[5] (Tr. 23)  She asked Acosta in Spanish whether he understood the warnings, using the text printed on the Spanish-language Miranda card, and Acosta answered "yes." (Tr. 25)  Agent Lisboa then read Acosta, in Spanish, the language from the Miranda card asking whether Acosta was willing to answer questions, and Acosta said "yes." (Tr. 26)

Agent Lisboa then questioned Acosta in Spanish. (Tr. 28)  In response to the agent's questions, Acosta stated that he and his wife had driven from Boston to New York in the silver Honda FIT, that was he was staying in Apartment 1B at 1104 East Tremont Avenue, and that his wife was currently in Apartment 1B. (Tr. 28-29)  Acosta's answers were fully responsive to Agent Lisboa's questions, and he appeared to understand what was being said to him. (Tr. 28, 30, 88)

Agent Lisboa then asked Acosta, in Spanish, whether agents could search his belongings in Apartment 1B. (Tr. 28)  This topic was presented as a request and not as a declaration. (Tr. 72)  The agents did not threaten Acosta, nor did they make any promises to him in order to induce consent. (Tr. 30, 72, 89)  Acosta answered "yes" in Spanish to the search request. (Tr. 30, 71, 89)

Agent Lisboa then left the car and entered 1104 East Tremont Avenue with other agents. Agents knocked on the door to Apartment 1B and Domenech opened the door. (Tr. 31-

---

[5]  During the suppression hearing, Agent Lisboa read with proficiency a copy of the same Spanish-language Miranda card. (Tr. 24-25)

32)  Agent Lisboa, assisted by the building's superintendent, told Domenech in Spanish that Acosta was under arrest, and asked for permission to search Acosta's belongings, explaining that Acosta had consented to such a search.  (Tr. 32, 70-71, 101-02)  In speaking with Agent Lisboa, Domenech referred to Acosta as "Paco" and to herself as his wife.  (Tr. 32)  Domenech answered "okay" to Agent Lisboa's request to search Acosta's bag.  (Tr. 33-34)  In Acosta's bag, Agent Lisboa found approximately 1,000 oxycodone pills.  (Tr. 35-36; see GX-2 (photograph of pills))

After Agent Lisboa discovered the oxycodone pills, Domenech stated that they were not her pills and that she did not know why they were in Acosta's bag.  (Tr. 36-37)  She also stated that she and Acosta had just driven from Boston to the Bronx in a Honda FIT.  (Tr. 37)  Domenech stated that she was the registered owner of the Honda, but that it was "Paco's vehicle."  (Tr. 37)

Agent Lisboa then left Apartment 1B and returned to the car where Acosta was seated.  Agent Lisboa showed Acosta the pills and asked whether they belonged to him.  (Tr. 38)  Acosta said that the pills were his and that his wife had no knowledge of them.  (Tr. 38)  Acosta also stated that he had just come down from Boston in the Honda FIT with the pills.  (Tr. 37-38, 93)

Agent Hom then asked Acosta, in Spanish, for permission to search the Honda FIT.  (Tr. 93, 104)  Acosta consented.  (Tr. 93)  Agents then searched the Honda FIT and recovered a cell phone.  (Tr. 104; Domenech Aff. ¶ 40)

Agent Lisboa testified that Acosta never asked for a lawyer and never indicated that he wanted questioning to stop.  (Tr. 39)  After the Honda FIT was searched, Acosta was transported to the DEA's Manhattan office.  (Tr. 93-94)  No further questioning took place.  (Tr. 38)  The following day, January 18, 2012, a criminal complaint was filed against Acosta

charging him with conspiracy to distribute one kilogram and more of heroin in violation of 21 U.S.C. § 846.  (See Cmplt. (Dkt. No. 1))

       **D.**      **Identification Evidence**

              Agent Lisboa also testified about CW-1 and CW-2's identification of Acosta as "Paco."  As discussed above, Agent Lisboa sent two photographs of Acosta to CW-1 via text message, and CW-1 identified the individual in the photographs as "Paco."  Agent Lisboa chose this method of identification because of the need to immediately confirm that the agents had correctly identified Acosta as "Paco."  (Tr. 41-42)  CW-1's identification was based on numerous meetings and narcotics transactions with "Paco."  (Tr. 42)  The length of the relationship between CW-1 and "Paco" was corroborated by the toll records for CW-1's cell phone, which showed that CW-1 was in regular contact with Paco's Cell Phones.  (Tr. 42-46; see GX-5; GX-6 (toll records))

              As for CW-2, Agent Lisboa testified that in mid-February 2012, CW-2 identified a photograph of Acosta from a "photo book" as the individual he knew as "Paco."  (Tr. 47-49; see GX-4 (photos from photo array))  CW-2 told agents that he had known "Paco" since 2006 and had met with him on numerous occasions, including for purposes of conducting narcotics transactions.  (Tr. 50)  Toll records for phones recovered from CW-2 at the time of CW-2's arrest confirmed that CW-2 was in regular contact with Paco's Cell Phones.  (Tr. 50-51; see GX-5; GX-6 (toll records))

## DISCUSSION

**I.**     **ACOSTA'S SUPPRESSION MOTION**

              Acosta has moved to suppress:  (1) evidence seized from his person on January 17, 2012; (2) post-arrest statements in which he told agents that he was staying at 1104 East

Tremont Avenue, Apartment 1B, that he consented to a search of his belongings in that

apartment, that he is known as "Paco," and that the oxycodone pills belonged to him; (3) the

oxyocodone pills seized from inside Apartment 1B; (4) the cell phone seized from inside the

Honda FIT vehicle; and (5) evidence obtained as a result of CW-1 and CW-2's identifications of

Acosta as "Paco."  (Dkt. Nos. 19, 33)

> **A.    Whether There Was Probable Cause for the
> GPS Tracking Warrant and for Acosta's Arrest**

Acosta argues that the GPS tracking warrant was not supported by probable

cause[6] and that, in any event, the evidence seized from his person must be suppressed because

there was no probable cause for his arrest.  (Def. Supp. Br. (Dkt. No. 36) at 4-6; Def. Post-Hrg.

Br. (Dkt. No. 44) at ¶¶ 5, 8)  According to Acosta, at the time of his arrest, agents "only knew 1)

that the perpetrator was known to go by the name 'Paco;' 2) the general location where the

defendant might be found; 3) a general description of the perpetrator; and 4) that the defendant

somehow responded to a name being called out on a public street."  (Def. Supp. Br. (Dkt. No.

36) at 5)  Based on this information, Acosta argues, agents "would have had nothing more than

reasonable suspicion to conduct a limited [Terry stop]," and did not have probable cause to arrest

him.  (Id.)  Acosta also notes that agents had to "confirm" his identity as "Paco" by sending

photos of him to CW-1, demonstrating that they did not have probable cause to arrest him.  (Id.

at 5-6)

---

[6]  This argument was not raised in Acosta's suppression motion (see Dkt. Nos. 19, 33), but instead was presented for the first time in a post-hearing brief.  (Dkt. No. 44)  This alone is grounds for rejecting Acosta's claim.  See, e.g., United States v. Wilson, 11 F.3d 346, 353 (2d Cir. 1993); United States v. Howard, 998 F.2d 42, 52 (2d Cir. 1993).  Nevertheless, the Court will consider whether the GPS tracking warrant was supported by probable cause.

### 1.    **Applicable Law**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const., Amend. IV.  "A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed."  United States v. Delossantos, 536 F.3d 155, 158 (2d Cir. 2008) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004) and United States v. Watson, 423 U.S. 411, 417 (1976)).

"[P]robable cause to arrest exists when [the arresting] officers have 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'"  Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).  "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).

The probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  Maryland v. Pringle, 540 U.S. 366, 370 (2003) (quoting Gates, 462 U.S. at 231).  "Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest."  Delossantos, 536 F.3d at 159.

Once probable cause to arrest exists, officers may search the defendant's person incident to the arrest.  See Arizona v. Gant, 556 U.S. 332, 338 (2009) (noting that officers may, without a warrant, conduct "a search incident to a lawful arrest").  A search incident to arrest

includes "'the arrestee's person and the area "within his immediate control."'" Id. (quoting

Chimel v. California, 395 U.S. 752, 763 (1969)).

    As to the GPS tracking warrant, it is an open question in this Circuit whether the

Government is required to demonstrate probable cause to obtain such a warrant.  Compare In re

Application of the United States for an Order for Prospective Cell Site Location Information on a

Certain Cellular Tel., 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (authorizing prospective acquisition

of cell site records under the authority of 18 U.S.C. §§ 2703(d) & 3121, et seq.) and In re

Application for an Order for Disclosure of Telecomm. Records and Authorizing the Use of a Pen

Register and Trap and Trace, 405 F. Supp. 2d 435 (S.D.N.Y. 2005) (same) with In re Application

of United States for an Order Authorizing Use of a Pen Register with Caller Identification

Device Cell Site Location Auth. on a Cellular Tel., 2009 WL 159187 (S.D.N.Y. Jan. 13, 2009)

(holding that the Government must establish probable cause to secure a GPS tracking warrant for

a cell phone) and In re Application of the United States for an Order (1) Authorizing the Use of a

Pen Register & a Trap & Trace Device and (2) Authorizing Release of Subscriber Information

and/or Cell Site Information, 396 F. Supp. 2d 294, 295 (E.D.N.Y. 2005) (holding that the

Government cannot obtain real-time GPS tracking data without demonstrating probable cause).

    It is not necessary for this Court to determine whether the Government is required

to demonstrate probable cause for the issuance of a GPS tracking warrant.  Assuming arguendo

that such a requirement exists, it was amply met here.

    **2.**  **Analysis**

      **a.**  **Probable Cause to Obtain GPS Tracking Warrant**

    As an initial matter, Judge Fox's determination that the application for the GPS

tracking warrant was supported by probable cause is entitled to substantial deference.  See Gates,

462 U.S. at 236 ("A magistrate's determination of probable cause should be paid great deference by reviewing courts."); United States v. Jakobetz, 955 F.2d 786, 803 (2d Cir. 1992) ("Determinations by magistrates and judges who issue warrants are accorded great deference and any doubts should be resolved in favor of upholding the warrant[s]." (internal quotation marks and citations omitted)).

        The Lisboa Affidavit establishes that (1) a Boston drug dealer using the name "Paco" supplied the heroin seized by agents on November 22, 2011; (2) "Paco" deals in significant quantities of heroin; (3) "Paco" is a "tall, stocky, overweight Dominican . . . approximately 45 to 46 years old"; (4) "Paco" uses his cell phones to conduct drug trafficking; (5) the cell phones "Paco" uses have Massachusetts area codes; (6) use of the Paco Cell Phones ceased after CW-1's November 22, 2011 arrest; and (7) "Paco" has an extraordinary amount of cell phone contact with a cell phone assigned the number (718) 772-7012. As Agent Lisboa explains in her affidavit, analysis of toll records reveals that – after November 22, 2011 – the user of the 718 Number migrated from the Paco Cell Phones to a series of other cell numbers with Massachusetts area codes. The user of these Massachusetts cell numbers rapidly opened and closed accounts, strongly suggesting an effort to evade law enforcement. Finally, the Target Cell Phone, activated shortly before Acosta's arrest, was in frequent contact with at least 17 numbers regularly called by the Paco Cell Phones. From these facts, there was probable cause to believe that the Target Cell Phone was a successor to the Paco Cell Phones and that tracking of GPS data associated with the Target Cell Phone would reveal "evidence of a crime" and "property designed for use, intended for use, or used in committing a crime." Fed. R. Crim. P. 41(c).

### b.  Probable Cause to Arrest

Given the GPS data, agents had probable cause to believe that "Paco," the person using the Target Cell Phone, was in the vicinity of 1104 East Tremont Avenue in the Bronx on January 17, 2012.  The presence of the silver Honda FIT with Massachusetts license plates outside 1104 East Tremont Avenue corroborated the GPS data indicating that "Paco" was nearby.  Agent Lisboa observed a group of men outside 1104 East Tremont Avenue, one of whom fit the cooperating witnesses' description of "Paco."  She called out "Paco," and this man – and no one else – turned around.  The man who responded to the name "Paco" was Acosta. Given these facts, agents had probable cause to believe that Acosta was "Paco."

The agents' decision to text photos of Acosta to CW-1 for confirmation does not demonstrate that they lacked probable cause to arrest Acosta.  Sending the photos was simply prudent and proper police work.  Such efforts "to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect," Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009) do not vitiate probable cause.

Acosta's motion to suppress evidence recovered from his person at the time of his arrest will be denied.

### B.  Acosta's Motion to Suppress Post-Arrest Statements

Acosta argues that his post-arrest statements must be suppressed because he did not receive Miranda warnings, and any waiver of his right to remain silent was thus not knowing and voluntary.  (Def. Moving Br. (Dkt. No. 23) at 4)  The post-arrest statements at issue fall into two categories:  (1) Acosta's pre-Miranda statements that he is known as "Paco," lives in Boston, and is staying in Apartment 1B at 1104 East Tremont Avenue; and (2) Acosta's post-Miranda

15

statements that the oxycodone pills were his, that he had brought the pills with him in the Honda FIT from Boston, and that Domenech had no knowledge of these pills.

### 1.    Pre-Miranda Statements

The pre-Miranda statements fall within the "pedigree exception" to Miranda, which provides that "the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by Miranda." United States v. Adegbite, 846 F.2d 834, 838 (2d Cir. 1998); see United States v. Tavares, No. 01 CR. 1115 (JFK), 2002 WL 31571662 at * 7 (S.D.N.Y. Nov. 18, 2002) ("The enumerated questions asked by Agent Cousin on the street . . . as to Wilson's name, age, address, and alien status . . . fall within this [pedigree] exception to the Miranda rule."); United States v. Garcia, No. 98 CR. 913 (SWK), 1999 WL 216653 at *8 (S.D.N.Y. Apr. 13, 1999) ("[Q]uestions about the locations of [the defendant's] past and present residences, as well as his mother's present residence . . . fall[] within the 'pedigree' exception. . . ."). Accordingly, the agents' questions regarding Acosta's name, where he lives, and where he is staying in the Bronx fall within the pedigree exception to Miranda. Acosta's motion to suppress these statements will therefore be denied.

### 2.    Post-Miranda Statements

Acosta argues that he was not given Miranda warnings, and that any warnings that were administered were not read by someone sufficiently proficient in Spanish to communicate these rights to Acosta. The presence of five agents led Acosta to feel pressure to make statements, and given that Miranda warnings were not properly administered, "he did not know he was allowed to refuse to consent." (Def. Moving Br. (Dkt. No. 23) at 4; Def. Post-Hrg. Br. (Dkt. No. 44) at ¶ 9) The Government argues that Agent Lisboa properly read Acosta his

<u>Miranda</u> rights in Spanish and that Acosta then voluntarily waived those rights and answered the agents' questions.  (Gov't Post-Hrg. Br. (Dkt. No. 44) at 27-29)

### a.      **Applicable Law**

In <u>Miranda v. Arizona</u>, the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning. . . . [the following] [p]rocedural safeguards must be employed to protect the privilege [against self-incrimination]":

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.  Opportunity to exercise these rights must be afforded to him throughout the interrogation.  After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.  But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

384 U.S. at 478-79.

"The purpose of the <u>Miranda</u> warning is to ensure that the person in custody has sufficient knowledge of his or her constitutional rights relating to the interrogation and that any waiver of such rights is knowing, intelligent, and voluntary."  <u>United States v. Carter</u>, 489 F.3d 528, 534 (2d Cir. 2007) (citing <u>Miranda</u>, 384 U.S. at 444-45).  Only unwarned statements made in response to interrogation are subject to suppression, however.

"To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right."  <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995) (<u>per</u> <u>curiam</u>).  "Only if the totality of the circumstances 'reveals both an uncoerced choice and the requisite level of comprehension may a court properly

conclude that the <u>Miranda</u> rights have been waived.'" <u>United States v. Male Juvenile</u>, 121 F.3d 34, 40 (2d Cir. 1997) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)). "A voluntary relinquishment of a right occurs when the relinquishment is the 'product of a free and deliberate choice rather than intimidation, coercion, or deception.'" <u>Id.</u> at 41 (quoting <u>Moran</u>, 475 U.S. at 421).

        **b.**    <u>**Analysis**</u>

      The evidence offered at the suppression hearing establishes that Acosta was adequately advised of his <u>Miranda</u> rights in Spanish, knowingly and voluntarily waived those rights, and then answered the agents' questions. Agent Lisboa demonstrated at the hearing that she had sufficient proficiency in Spanish to read the DEA-issued Spanish-language <u>Miranda</u> card and to ascertain from Acosta whether he wished to waive his rights. (<u>See</u> Tr. 24-26 (Agent Lisboa reading <u>Miranda</u> card in Spanish))

      Given Agent Lisboa's study of Spanish in high school and college, her use of Spanish socially, and her use of Spanish in the regular performance of her duties as a DEA agent, the Court further concludes that she was sufficiently proficient in Spanish to ask Acosta where he was coming from, what his name was, where he was staying, and whether he agreed to allow agents to search his belongings. (Tr. 18, 28-29, 68) The sufficiency of Agent Lisboa's Spanish is corroborated by the fact that Acosta's answers to her questions were fully responsive and coherent. There was no confusion. Acosta stated that he had just driven down from Boston to the Bronx with his wife in the Honda FIT; that he goes by the name "Paco"; that he was staying in Apartment 1B of 1104 East Tremont Avenue; that his wife was currently in the apartment; and that he consented to a search of his belongings. (Tr. 28-29) Both Agents Lisboa and Hom testified that they believed Acosta understood what was being said to him, because he responded

directly to the questions posed and because his facial expressions and demeanor indicated that he understood.  (See Tr. 28-29, 72, 88-89)  The Court finds this testimony fully credible.

After agents recovered approximately 1,000 oxycodone pills from Acosta's bag inside Apartment 1B, agents asked Acosta whether the pills were his.  (Tr. 38)  Acosta responded that the pills were his, that he brought them with him in the Honda FIT, and that Domenech had no knowledge of the pills.  (Id.)  Once again, there is no basis to find that Acosta did not understand what was said to him.

While the Court has considered Acosta's affidavit – in which he claims that no Miranda warnings were administered at the scene (Acosta Aff. ¶ 13) – Agent Lisboa's testimony is entitled to more weight because it was subject to cross-examination.  See, e.g., United States v. Fuentes, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting witness testimony over defendant's sworn statement regarding whether he gave consent); United States v. Robles, 253 F. Supp. 2d 544, 549 n.14 (S.D.N.Y. 2002) (noting that courts "'give greater weight to [witness] testimony, which was subject to cross examination, than to affidavits'") (quoting United States v. Gardner, 611 F.2d 770, 774 n.2 (9th Cir. 1980)); United States v. Juliano, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to defendant's affidavit, because the court could not assess the defendant's credibility and the testimony of Government witnesses was "forthright and truthful") (citing United States v. Frank, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998)).

The Court finds Agent Lisboa and Agent Hom's account of the questioning of Acosta to be entirely credible.  Accordingly, Acosta's motion to suppress his post-arrest statements will be denied.

### C.    Acosta's Motion to Suppress Physical Evidence from Apartment 1B

Acosta argues that the oxycodone pills recovered from his bag in Apartment 1B should be suppressed because he did not consent to a search of his bag.  (Def. Moving Br. (Dkt. No. 23) at 9)

### 1.    Applicable Law

"It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).

> The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary.  United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983).  Voluntariness is a question of fact determined by a "totality of all the circumstances."  Schneckloth[], 412 U.S. [at], 227. . . . "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'"  United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (quoting United States v. Sanchez, 32 F.3d 1330, 1334 (8th Cir.1994)); see Florida v. Jimeno, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

United States v. Isiofia, 370 F.3d 226, 230-31 (2d Cir. 2004).

When analyzing the Schneckloth totality of the circumstances voluntariness test, courts should consider the "age, education, [and] intelligence [of the defendant], [the] length of detention, [the] use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights."  United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986) (citing Schneckloth, 412 U.S. at 226)  Other pertinent considerations include whether the defendant was "familiar with police questioning . . . has an extensive criminal record . . . [and] was familiar with his Miranda rights."  United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995).

20

"A person placed in official custody is not thereby rendered incapable of giving his free and voluntary consent to a warrantless search."  United States v. Moreno, 897 F.2d 26, 33 (2d Cir. 1990).  However, while "the fact that a defendant is in custody does not alone vitiate his consent to a search . . . , consent to search obtained from a person in custody does 'require more careful scrutiny.'"  Puglisi, 790 F.2d at 243 (quoting United States v. Wiener, 534 F.2d 15, 17 (2d Cir. 1976)).

> [I]n cases where consent is obtained from a person in custody, . . . whether guns were drawn or the consenting individual was frisked, or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search are simply relevant factors in determining the voluntariness of the consent.

Id. at 243-44 (2d Cir. 1986) (internal citations omitted).

"[T]he government has no affirmative obligation to advise the defendant of his right to refuse consent to search; rather, that is one factor to be taken into account in determining voluntariness."  United States v. Schaefer, 859 F. Supp. 2d 397, 407 (E.D.N.Y. 2012); see United States v. Drayton, 536 U.S. 194, 206-07 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.").  Finally, a defendant may consent to a search even if he has not been informed in advance of his Miranda rights.  See Moreno, 897 F.2d at 33 ("The fact that Moreno was not informed of his Miranda rights prior to the search does not affect our conclusion, since Miranda does not 'require[ ] the conclusion that knowledge of a right to refuse is an indispensable element of a valid consent.'" (quoting Schneckloth, 412 U.S. at 246)).

2.    **Analysis**

In his moving brief, Acosta argues that he did not consent to a search of his belongings in Apartment 1B, was never asked in Spanish to consent to such a search, was "surrounded by police," was never read <u>Miranda</u> warnings, and was not aware that he could refuse consent to a search.  (Def. Moving Br. (Dkt. No. 23) at 7-9; <u>see</u> Acosta Aff. ¶¶ 16-17)  In his post-hearing brief, Acosta argues that "the phrases used by Agent Lisboa to obtain defendant's consent to search were ambiguous in their meaning and could either be translated as 'can we search' the apartment, or the more declarative form 'we can search' the apartment," and thus the agents "may have declared to defendant they had the ability to search apartment #lB."  (Def. Post-Hrg. Br. (Dkt. No. 44) at ¶¶ 4-5)

At the suppression hearing, Agent Lisboa repeated, in Spanish, how she "generally . . . phrased" her request to Acosta for consent to search his belongings.  (Tr. 29)  The court interpreter initially translated Agent Lisboa's testimony as "[c]an we enter into your house and look for your things."  (Tr. 30)  After consultation with another court interpreter, both interpreters indicated that the Spanish used by Agent Lisboa could be translated as both "'we can' or 'can we['] enter into your house and look for your things.'"  (Tr. 54, 69-70)  The interpreters made clear that the correct translation turns on the tone and inflection of the speaker – <u>i.e.</u>, whether the speaker is speaking in a questioning tone or not.  (<u>See</u> Tr. 55 ("It could be interpreted in two different ways depending on . . . the way it was said."))

Agents Lisboa and Hom both testified that Acosta was asked for consent in a questioning tone.  (Tr. 72, 89)  Agent Lisboa testified:

Q.    When you asked the defendant for permission to search his belongings, did you ask it as a question, or did you say it as a statement?

A.    As a question.

(Tr. 72; see also Tr. 28 ("I asked Paco for a consent to search his belongings in the apartment 1B (emphasis added)))  Likewise, Agent Hom testified that Acosta was asked for consent "in a question type of tone."  (Tr. 89)  The agents' testimony also indicates that Acosta appeared to understand that his consent was being sought:  both agents testified that Acosta answered "yes" to the request for consent.  (Tr. 30, 71, 89)  That Acosta answered Agent Lisboa's question affirmatively demonstrates that he understood that she was asking a question, and not announcing her right to search Acosta's belongings.  See United States v. Perez, 37 F.3d 510, 515 (9th Cir. 1994) (rejecting defendant's claim that he did not understand officers' request for consent when his answers to the officers' other questions were responsive).

Acosta's claims that he was not asked in Spanish to provide consent, that he did not provide consent, that he was not read Miranda warnings, and that he was "surrounded by police" when consent was sought, are not supported by the evidence. (See Def. Moving Br. (Dkt. No. 23) at 7-9; Acosta Aff. ¶¶ 16-17)  The Court finds fully credible Agent Lisboa's testimony about her exchange with Acosta regarding consent to search.  The evidence further establishes that only Agent Lisboa and Agent Hom were in the vehicle with Acosta when consent was sought.  (Tr. 21)  Finally, as noted above, the evidence demonstrates that Agent Lisboa administered Miranda warnings in Spanish to Acosta at the scene.  While Acosta was not told that he could refuse consent to search, "the government has no affirmative obligation to advise the defendant of his right to refuse consent to search." Schaefer, 859 F. Supp. 2d at 407.

Acosta's motion to suppress the evidence obtained from the search of his bag in Apartment 1B will be denied.

**D.**      **Acosta's Motion to Suppress Physical Evidence from the Honda FIT**

Acosta argues that the search of the Honda FIT was unlawful and that the cell phone recovered from inside the van should be suppressed.[7]  (Def. Moving Br. (Dkt. No. 23) at 11-12)  The Government argues that the search of the vehicle was proper because Acosta voluntarily consented to the search.  (Gov't Post-Hrg. Br. (Dkt. No. 46) at 40-41)

Agent Hom testified that after the search of Acosta's belongings in Apartment 1B, he asked Acosta, in Spanish, for permission to search the Honda FIT.  (Tr. 93, 104)  Acosta responded affirmatively.  (Tr. 93)  Agents then searched the Honda FIT and recovered a cell phone.  (Tr. 104; Domenech Aff. ¶ 40)

Acosta argues that Agent Hom does not have sufficient Spanish proficiency to have obtained consent from Acosta.  (Def. Post-Hrg. Br. (Dkt. No. 44) at ¶ 9)  Acosta points out that at the suppression hearing, Agent Hom was not able to translate "you have a right to remain silent" into Spanish.  (Id.; see Tr. 95)  Furthermore, when the Government asked Agent Hom to repeat "the precise words" in Spanish that he used to ask for Acosta's consent, Agent Hom replied that he could not recall.  (Tr. 93)  When asked whether he understands Spanish, Agent Hom stated, "a little bit."  (Tr. 86)  Given this record, this Court cannot find that Agent Hom was sufficiently proficient in Spanish to have obtained consent from Acosta to search the Honda FIT.

The evidence before the Court demonstrates, however, that agents obtained consent from Domenech to search the Honda, and that she was in a position to give valid consent.  While in Apartment 1B, Domenech told agents that she was the registered owner of the Honda.  (See Tr. 37 ("[Domenech] stated that the Honda Fit . . . was in her name"))  In their

---

[7]  It is not clear whether the Government would seek to introduce the phone at trial.  The parties do not disclose whether it has any evidentiary value.

affidavits, Acosta and Domenech repeat that "[t]he Honda van belonged to [Domenech]," and they attach as an exhibit a certificate of title for the Honda that lists Domenech as the sole owner. (Domenech Aff. ¶¶ 33-34 ("[t]he Honda van belonged to me, not Carlos"); id., Ex. A (certificate of title); Acosta Aff., ¶ 21 (noting that the Honda FIT was his "wife's car").  Agents asked Domenech for the keys to the Honda so that they could search the vehicle, and Domenech provided agents with those keys.[8]  (Domenech Aff. ¶¶ 32, 35, 38)

Given that Domenech told agents that she was the registered owner of the Honda, and given that she possessed keys for the car, her consent provided agents with "'a reasonable basis for believing that there had been consent to search.'"  Garcia, 56 F.3d at 423 (quoting United States v. Sanchez, 32 F.3d 1330, 1334-35 (8th Cir. 1994)); see also United States v. Gonzalez Athehorta, 729 F. Supp. 248, 256 (E.D.N.Y. 1990) ("'[1] consent to a search by one with access to the area searched, and [2] either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search.'" (quoting United States v. Gradowski, 502 F.2d 563, 564 (2d Cir. 1974) (per curiam)  (valid consent to search where consenting party was in possession of car and keys); see id. ("The individual who possesses the keys to the automobile clearly has an exclusive possessory interest in the vehicle [and therefore could consent to a search of the vehicle].").

Accordingly, Acosta's motion to suppress evidence seized from the Honda FIT will be denied.[9]

---

[8]   While Domenech asserts that she "only gave [agents] the keys to search the Honda van because [she] thought [she] had no choice," and that "[h]ad [she] known [she] was permitted to refuse to allow the search, [she] would not have permitted it" (Domenech Aff. ¶ 39), "the government has no affirmative obligation to advise the [owner of property] of his [or her] right to refuse consent to search."  Schaefer, 859 F. Supp. 2d at 407.

[9]   The Government also argues that the search of the Honda FIT was permissible under the automobile exception to the Fourth Amendment's warrant requirement.  (Gov't Post-Hrg. Br.

E.      **Acosta's Motion to Suppress Identification Evidence**

Acosta argues that CW-1's and CW-2's identifications should be suppressed

because of the Government's use of unduly and unnecessarily suggestive identification

---

(Dkt. No. 46) at 39-40)  Under this exception to the warrant requirement, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004) (citing Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam) and Carroll v. United States, 267 U.S. 132, 151-62 (1925)).  This exception applies even where "there is little practical likelihood that the vehicle will be driven away," because "[t]he mere inherent mobility of the vehicle is sufficient to constitute the 'ready mobility' the automobile exception cognizes." United States v. Howard, 489 F.3d 484, 494 (2d Cir. 2007).

Although Acosta told agents that he had used the Honda FIT to transport oxycodone pills from Boston to New York (Tr. 38), by the time agents searched the vehicle they had already recovered those pills in Acosta's bag inside Apartment 1B.  There is no evidence in the record demonstrating that agents had reason to believe that other contraband or evidence of a crime was then stored inside the Honda.  While documents disclosed by the Government pursuant to the Jencks Act, 18 U.S.C. § 3500 et seq., indicate that a canine conducted an "open air sniff of the vehicle" and detected the presence of narcotics (see 3501-H (Jan. 17, 2012 Seizure/FIRE form), the Government did not introduce this evidence at the hearing.  Under these circumstances, the Court cannot find that search of the Honda falls within the automobile exception to the warrant requirement.

The Government also argues that the recovered cell phone is admissible under the "inevitable discovery" exception to the warrant requirement, because the Honda FIT was subject to forfeiture and an inventory search.  (Gov't Post-Hrg. Br. (Dkt. No. 46) at 40 n.6)  "Under the inevitable discovery doctrine, 'evidence that was illegally obtained will not be suppressed "if the government can prove that the evidence would have been obtained inevitably," even if there had been no statutory or constitutional violation.'" United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002) (quoting United States v. Roberts, 852 F.2d 671, 675-76 (2d Cir. 1988) (quoting Nix v. Williams, 467 U.S. 431, 447 (1984))).  In order for the Government to assert this exception in the context of an inventory search, it must prove "(1) that the police had legitimate custody of the vehicle . . . so that an inventory search would have been justified, . . . (2) that when the police in the police agency in question conducted inventory searches, they did so pursuant to 'established' or 'standardized' procedures, . . . [and] (3) that those inventory procedures would have 'inevitably' led to the 'discovery' of the challenged evidence." Id. at 138.

Section 3500 material disclosed by the Government indicates that the Honda was in fact seized (see 3501-H (Jan. 17, 2012 Seizure/FIRE Form), and it is reasonable to assume that an inventory search of the vehicle was performed.  But the Government introduced no evidence of such an inventory search at the hearing.  Accordingly, the Government cannot rely on the inevitable discovery doctrine to justify the search of this vehicle.

procedures.  (Def. Moving Br. (Dkt. No. 23) at 12-15)  Acosta also argues that the Government

has not disclosed sufficient information about the circumstances surrounding CW-2's

identification of Acosta from a photo array for it to be considered a reliable identification.  (Def.

Reply (Dkt. No. 27) at 6-7)

### 1.   **Applicable Law**

Courts conduct a two-stage analysis in considering the admissibility of

identification evidence:

> "The court must first determine whether the pretrial identification procedures
> unduly and unnecessarily suggested that the defendant was the perpetrator.  If the
> procedures were not suggestive, the identification evidence presents no due
> process obstacle to admissibility; no further inquiry by the court is required, and
> the reliability of properly admitted eyewitness identification, like the credibility of
> the other parts of the prosecution's case is a matter for the jury.  If the court finds,
> however, that the procedures were [unnecessarily] suggestive, it must then
> determine whether the identification was nonetheless independently reliable.  In
> sum, the identification evidence will be admissible if (a) the procedures were not
> [unnecessarily] suggestive or (b) the identification has independent reliability."

Brisco v. Ercole, 565 F.3d 80, 88 (2d Cir. 2009) (quoting Raheem v. Kelly, 257 F.3d 122, 133

(2d Cir. 2001) (alterations in original)).

With respect to the first element, the Second Circuit has stated that "an

identification procedure may be deemed unduly and unnecessarily suggestive if it is based on

police procedures that create 'a very substantial likelihood of irreparable misidentification.'"  Id.

(quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).  With respect to a "showup"

procedure – such as that used by Agent Lisboa here when she sent photos of Acosta to CW-1 via

text message – the Second Circuit has stated:

> While a "showup" procedure is inherently suggestive because it involves the
> presentation of a single suspect to a witness by the police (as opposed to a lineup,
> in which several individuals are presented to the police, only one of whom is the
> suspect), and has accordingly been "widely condemned," Stovall v. Denno, 388
> U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), "a claimed violation of

due process in the conduct of a confrontation depends on the totality of the circumstances surrounding it."  Id.  Accordingly, a showup identification violates due process only if it is an "unnecessarily suggestive" procedure.  Id. (emphasis added).

Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect.  See, e.g., id. (concluding that suggestive showup identification procedure did not violate due process because sole eyewitness to crime was at risk of dying and was unable to travel from her hospital bed to police station for lineup); United States v. Bautista, 23 F.3d 726, 730 (2d Cir. 1994) (Oakes, J.) ("[A] prompt showing of a detained suspect at the scene of arrest has a very valid function:  to prevent the mistaken arrest of innocent persons." (internal quotation marks omitted)).  Thus, we have instructed that where an officer has "or should have doubts whether a detained suspect is in fact the person sought, the officer must make 'immediate reasonable efforts to confirm the suspect's identity,' " id. ( quoting United States v. Valez, 796 F.2d 24, 27 (2d Cir. 1986)), and we have held that identification evidence from showups held in close temporal and geographic proximity to the crime scene may be admitted, see, e.g., Bautista, 23 F.3d at 731; United States ex rel. Cummings v. Zelker, 455 F.2d 714, 716 (2d Cir. 1972) (holding that showup procedure was necessary to insure "the immediate release of an innocent suspect and at the same time to enable the police to resume the search for the fleeing culprit while the trail [was] still fresh").

Even if an identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable.

Id. at 88-89.

## 2.   **Discussion**

Agent Lisboa testified at the suppression hearing that CW-2 identified a photograph of Acosta from a photo array.  (Tr. 47-49; see GX-4 (photos from photo array))

Acosta has not argued that this procedure was unduly suggestive, and this Court finds there is no basis for such a conclusion:

If there is nothing inherently prejudicial about the presentation [of a photo array], such as use of a very small number of photographs, or the utterance of suggestive comments before an identification is made, the "principal question is whether the picture of the accused, matching descriptions given by the witness, so stood out

from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'"

United States v. Thai, 29 F.3d 785, 808 (2d Cir. 1994) (quoting Jarrett v. Headley, 802 F.2d 34, 41 (2d Cir. 1986) (quoting United States v. Archibald, 734 F.2d 938, 940 (2d Cir. 1984)) (internal citations omitted).  Here, CW-2 was shown photos of thirteen men.  (Tr. 47-49; see GX-4 (photos from photo array))  There is no evidence that there is anything about Acosta's photograph that would "suggest to an identifying witness that [Acosta] was more likely to be the culprit."  Jarrett, 802 F.2d at 41 (see GX-4 (photos from photo array))

        As for CW-1's identification of Acosta from the photos Agent Lisboa sent him via text message, Acosta has not demonstrated that the identification procedure used by the agent was unnecessarily suggestive.  Agent Lisboa testified that she sent CW-1 the photographs in order to confirm that Acosta was "Paco."  (Tr. 20-21; see GX-3 (photographs of Acosta))  After viewing these photographs, CW-1 confirmed that Acosta was "Paco."  (Tr. 21, 40, 42)  The Second Circuit has upheld the use of showup identification procedures where there are exigent circumstances, such as where – as here – agents need to quickly confirm that they have arrested the right person.  See Brisco, 565 F.3d at 88 ("Exigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary in such circumstances to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect."); see also Zelker, 455 F.2d at 716) (noting that "prompt on-the-scene confrontation is 'consistent with good police work'" (quoting United States v. Sanchez, 422 F.2d 1198, 1200 (2d Cir. 1970)).  Given the need to "quickly confirm [Acosta's] identity [as Paco]," Brisco, 565 F.3d at 88, this Court cannot conclude that the procedure employed to confirm that fact was unnecessarily suggestive.

Finally, the reliability of both identifications is confirmed by the length of the relationship between Acosta and the cooperating witnesses.  (Tr. 42-51; GX-5; GX-6 (toll records))

Acosta's motion to suppress the identification evidence will be denied.

## II.   ACOSTA'S MOTION FOR BRADY AND GIGLIO MATERIAL

Acosta seeks immediate production of evidence favorable to him under Brady v. Maryland, 373 U.S. 83 (1963), as well as all evidence that would be useful to impeach the credibility of any government witnesses under Giglio v. United States, 405 U.S. 150 (1972). (Def. Moving Br. (Dkt. No. 23) at 15-16)  The Government has indicated that it "has already alerted defense counsel to the fact that it is not presently aware of any [Brady] material in its possession."  (Gov't Post-Hrg. Br. (Dkt. No. 46) at 49)  As for Giglio material, the Government argues that the request "is premature, because the Government has not yet identified which witnesses it intends to call at trial," and in any event the Government is not required to disclose the identity of its prospective witnesses this far in advance of trial.  (Id. at 50).

Under the Due Process Clause, the Government has a continuing obligation to provide Brady material to the accused.  Brady, 373 U.S. at 87.  The Government has acknowledged its obligation and has indicated it will disclose any Brady material "promptly upon learning of its existence."  (Gov't Post-Hrg. Br. (Dkt. No. 46) at 49)  No more is required. See United States v. Gallo, No. 98 CR. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying motion to compel production of Brady material where "the Government represents that it is aware of its obligations under Brady . . . and will produce any Brady material to the defense well before trial.  However, the Government represents that it is currently unaware of any Brady material.").

As for <u>Giglio</u> material, the Second Circuit has stated that the Government is only required to produce such material "in time for its effective use at trial." <u>United States v. Coppa</u>, 267 F.3d 132, 146 (2d Cir. 2001). The Government has represented that it will produce <u>Giglio</u> material shortly before trial at the same time that it produces prior statements made by prospective Government witnesses under the Jencks Act, 18 U.S.C. § 3500 <u>et seq</u>. (Gov't Post-Hrg. Br. (Dkt. No. 46) at 52)  Acosta has not explained why this disclosure schedule will not allow defense counsel adequate time to prepare for cross-examination of Government witnesses in the unlikely event that this case proceeds to trial.[10]

Accordingly, Acosta's motion for immediate production of <u>Brady</u> and <u>Giglio</u> materials will be denied.

## CONCLUSION

Acosta's pre-trial motions are denied in their entirety. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 19 and 33)

Dated: New York, New York
       May 6, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[10] Defense counsel has represented that "this case is not going to trial." (<u>See</u> Apr. 4, 2013 Tr. at 3)